**SOL S. TURNOFF DRUG DISTRIBU-TORS INC., on behalf of itself and all others similarly situated**

v.

**N. V. NEDERLANDSCHE COMBINATIE VOOR CHEMISCHE INDUS-TRIE et al.**

Civ. A. No. 69–1883.

United States District Court, E. D. Pennsylvania.

Aug. 19, 1970.

Seymour Kurland, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiffs.

Bernard J. Smolens, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Rexall Drug & Chemical Co.

Patrick T. Ryan, Philadelphia, Pa., for S.S.T. Corp. and Charles L. Huisking & Co.

Davis & Davis, Philadelphia, Pa., for Walker Chemicals, Inc.

H. Francis Delone, Richard G. Schneider, Dechert, Price & Rhoads, Philadelphia, Pa., for R. W. Greeff & Co.

K. R. Conrad, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Bristol Myers and Mead Johnson.

## OPINION I AND ORDER

WOOD, District Judge.

This is a motion for an order pursuant to Rule 23(c) (1) declaring that this case may be maintained as a class action. The amended complaint, which is similar to a prior criminal indictment returned against most of the defendants by a grand jury in New York on October 25, 1968, United States of America v. N. V. Nederlandsche Combinatie Voor Chemische Industrie et al., No. 68–Cr 870 (S.D.N.Y.1968), alleges that nineteen foreign and domestic business entities conspired to monopolize the quinine and quinidine products [1] industry by engaging in a variety of illegal practices including price-fixing, allocation of territorial markets and allocation of the supply of the raw material. It further is alleged that as a result of this conspiracy between the fall of 1958 and 1966 the price of quinine and quinidine products increased dramatically. In his initial complaint, plaintiff also claimed damages for price discrimination under the Robinson-Patman Act, but he has recently filed an amended complaint which omits this claim. Therefore we have before us on the instant motion only the question of whether a class action should be maintained with respect to the Sherman Act counts.

Plaintiff, Sol S. Turnoff Drug Distributors, Inc., which sells through both

[1]. In his "Brief in Support of Confirmation of the Wholesaler-Retailer Class", the plaintiff states that:
"All of the relevant products are derived from the bark of the cinchona tree, most of which comes from plantations located in Indonesia and in the Republic of the Congo. Quinine is extracted from the bark of the cinchona tree and combined with acids to form a variety of salts used for medicinal purposes, including the treatment and prevention of malaria. Most of the world's supply of quinidine is synthesized by isomerization of quinine. Its principal use is to restore and maintain a normal heartbeat in people suffering from irregular heartbeat or cardiac arrhythmia."

wholesale and retail outlets, seeks to represent a class consisting of:

" * * * all individuals, proprietorships, partnerships, corporations, and other business firms and entities (other than hospitals or physicians) doing business in the United States or the Commonwealth of Puerto Rico, who purchased, for pharmaceutical purposes, quinine, quinidine and other cinchona products as defined in the complaint, for resale in original or processed form at wholesale or retail." (complaint)

Although this language is somewhat vague, the plaintiff has made it clear in subsequent memoranda filed with us for consideration in determination of this motion that his proposed class includes only purchases of quinine products for wholesale and retail sales in the United States and that it excludes importers and manufacturers of quinine products. Plaintiff further avers that his class is readily identifiable because it is identical to the wholesaler-retailer class confirmed by Judge Wyatt in State of West Virginia v. Chas. Pfizer & Co., Inc., et al., D.C., 314 F.Supp. 710 (May 26, 1969, S.D. N.Y.) [2], and that the class members are readily ascertainable because there is available in the Clerk's Office of the Federal District Court for the Southern District of New York a computer print-out of the names and addresses of 51,-748 members of the proposed class, consisting of 51,016 retailers and 732 wholesalers.

█ In order to have his action qualify for class action treatment, the plaintiff has the burden of showing that the four prerequisites of Rule 23(a) are satisfied and, in addition, the proposed class action comes within one of the three categories enumerated in Rule 23 (b). Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa.1968). Since many of plaintiff's qualifications with respect to the relevant criteria under Rule 23 are well covered in his brief and accompanying documentation and have not been seriously contested by the defendants either in their briefs or at the hearing held on this motion, we will not treat all those qualifications at length, but will limit our primary consideration here to the points raised by the defendant.[3] The defendants first contend, citing Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y. 1968) that the plaintiff should be precluded from maintaining a class action at this point because he has "neither alleged nor proved a possibility of success on the merits". (Brief of Defendants in Opposition to Class Action, p. 7.) Moreover we are urged that "Absent a preliminary showing of a prima facie case, the class action, with all its attendant difficulties, should not be permitted to proceed." (*Ibid.*, P. 8)

█ As we have previously considered in our discussion of this point in our opinion in City of Philadelphia v. Emhart Corporation et al., D.C., 50 F.R.D. 232 (June 23, 1970), there is a conflict among the relevant authorities whether a preliminary showing of merit to the plaintiff's claim is a prerequisite to the maintenance of a class action:

"In Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y.1968) after a full op-

2. The so-called "antibiotics" cases.

3. Three of the defendant's initial objections, namely that his allegations of a class action were not of the specificity and in the form required by Local Rule 45, that he had not properly pleaded a claim under the Robinson-Patman Act, and that there would be numerous conflicts within the class with respect to the price discrimination allegations under the Robinson-Patman Act, have since been cured. Pursuant to our order of June 24, 1970, plaintiff filed an amended complaint which states the class action with sufficient specificity pursuant to Local Rule 45, and the plaintiff does not at this time seek a class action on his prior Robinson-Patman claims. (*Cf.* the Brief of the Defendants in Opposition to the Class Action.)

portunity for discovery, Judge Weinstein ordered a hearing at which he required the plaintiffs to show a 'substantial possibility that they will prevail on the merits' before allowing the class action to proceed and notice to be sent out. On the other hand, Judge Metzner in similar circumstances in Mersay v. First Republic Corporation of America, 43 F.R.D. 465 (S.D.N.Y.1968) reached a nearly opposite conclusion:

> * * * 'In this case such a hearing would be a fact-finding procedure that would deprive the plaintiff and the class of the right to a jury trial. It would turn rule 23 into a cumbersome procedure. I cannot conceive that the drafters of the rule intended necessarily extensive hearings to determine facts which may be ultimate to the litigation.' 45 F.R.D. at 469.

"Although the Second Circuit has not yet resolved the disparity between these two cases, see Green v. Wolf Corporation, 406 F.2d 291, 301, fn. 15 (2nd Cir. 1968), language in the recent decision of our Circuit in Kahan v. Rosenstiel, 424 F.2d 161 (1970), albeit on a somewhat different point, suggests that it inclines toward the less onerous rule from the plaintiff's point of view at least at the outset of the case

> * * * 'The determination whether there is a proper class does not depend on the existence of a cause of action. A suit may be a proper class action, conforming to Rule 23, and still be dismissed for failure to state a cause of action.' (p. 169)

"This would seem to be in accord with the suggestion of Professor Moore that the requisite preliminary showing be a 'minimal demonstration that the complainant is sincere and the aggregate group claim is substantial' or a demonstration that the claim put forth on behalf of the class is more than frivolous or speculative.' 3B Moore's Federal Practice, ¶ 23.45[3]. Cf. Philadelphia Electric Company v. Anaconda American Brass Co., supra."

With these authorities in mind, we are unable to conclude at this time that the plaintiff's allegations of conspiracy and the record in the case thus far are insufficient to warrant allowing this case to proceed further as a class action. In the first place, the plaintiffs have not had a full opportunity for discovery to demonstrate a prima facie case, if that is at some point in this litigation to be required. Cf. City of Philadelphia v. Emhart Corporation et al. Secondly, we are mindful of the findings of a Congressional investigation into the causes of rises in the price of quinine and quinidine, see Prices of Quinine and Quinidine Report of the Subcommittee on Antitrust and Monopoly to the Committee on the Judiciary United States Senate, pursuant to S.Res. 26, 90th Cong., 1st Session, (Comm. Print 1967), of the fact that substantial fines have been imposed by the Court pursuant to pleas of nolo contendere of some of the defendants pursuant to a criminal indictment on similar allegations to those made here, United States of America v. N. V. Nederlandsche Combinatie Voor Chemische Industrie et al., supra, and that the Commission of the European Communities which has jurisdiction over antitrust violations in the Common Market pursuant to Article 85 of the Treaty of Rome has found that certain defendants violated Article 85 and imposed substantial fines. It is sufficient for us to conclude, as did our colleague Judge Fullam, in Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa. 1968), cited by the defendants, that:

> " * * * It is enough for present purposes to state that the indictments, the sentences imposed thereunder, and some of the results of the discovery to date, together warrant a finding that plaintiffs' claim of conspiracy may

have merit and is a genuine issue in this litigation."

The defendants contend, however, that apart from the question of whether there is a sufficient demonstration of a genuine issue as to whether a conspiracy existed, we should deny the plaintiffs permission to maintain a class action because as a matter of law and regardless of what facts plaintiffs unearth in the course of discovery, plaintiff's class is too remote from the alleged injury as the result of the conspiracy to recover and the plaintiff for this reason fails to state a cause of action. In this respect it is argued that the decision of the Supreme Court in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) that under the circumstances of that case, the defendant (an alleged conspirator) was precluded from raising the defense against his immediate purchaser (the plaintiff) that the purchaser had "passed on" any price increment, in effect precludes anyone but an immediate purchaser from the defendants from recovery in this case. In this regard, we are referred to the extended discussion of this issue in the recent opinion of our colleague, Chief Judge John W. Lord, Jr., in Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., D.C., 49 F.R.D. 35 (April 6, 1970).

The difficult and far reaching issues raised by *Hanover Shoe* and its progeny certainly are relevant and must be resolved at some time in the course of this case. However, we think that issues such as this which relate to the legal possibility of recovery by a particular class of plaintiffs and not the existence of a conspiracy should, especially where plaintiffs representing several classes claim recovery against the same defendant, properly be raised by motions under the rules and procedures provided for that purpose. Rule 23 contains no provision for a determination of whether, as a matter of law, the plaintiff's class may recover from the defendants as the result of an alleged conspiracy, and we think that such a determination must be made under the procedures of Rule 12 (b) (6) or Rule 56. The separateness of the determination to be made by the Court under Rule 23, on the one hand, and, on the other hand, under Rules 12 (b) (6) and 56 was recently recognized by our Circuit Court in Kahan v. Rosenstiel, 424 F.2d 161 (February 20, 1970) in which, as previously noted, it was stated that:

" * * * The determination whether there is a proper class does not depend on the existence of a cause of action. A suit may be a proper class action, conforming to Rule 23, and still be dismissed for failure to state a cause of action."[4] (page 169)

We have already made the determination alluded to by Professor Moore as to whether, as a threshold matter, "the claim put forth on behalf of the class is more than frivolous or speculative"; and we do not at this point decide what showing on the merits we may require of the plaintiff before finally ordering notice to be sent out to other potential members of plaintiff's class. Notice involves a considerable burden to whoever must bear its expense, and a considerable amount of adverse publicity to the defendants before any adjudication of their culpability, and it is therefore conceivable that before taking such a major step a Court might want to determine whether at that point the plaintiff's claim was substantial. Compare Dolgow v. Anderson, supra. However, bearing in mind the direction of Rule 23(c) that we determine whether a class action may be maintained "as soon as practicable after the commencement of the

---

4. Compare Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967), where the Court also declined an invitation to prejudge the merits of a case at an inchoate stage.

action", and the provision of Rule 23(c) that such order may be conditional and may be altered or amended at any time, we think that most certainly at the initial stages, challenges to the legal sufficiency of the complaint must be made pursuant to the provisions of Rule 12(b)(6) or Rule 56, and that the contention that as a matter of law the plaintiff's class cannot recover should not be considered in determining whether, at this stage of the case, a class action may be maintained. Moreover, in this regard, in accordance with our conclusion in City of Philadelphia v. Emhart Corporation et al., D.C., 50 F.R.D. 232, (June 23, 1970), we:

> "will not approve the sending out of notices until any preliminary motions are disposed of, and until the defendants have had the opportunity, if they desire it, to challenge the substantiality of the plaintiff's case or to again contest the propriety of a class action after all the relevant facts are on the record. 3A Moore's Federal Practice, ¶ 23.45[3]; Fischer v. Kletz, 41 F.R.D. 377, 386 (S.D.N.Y.1966)."

▇▇ The defendant's final contention is that we should not allow a class action to be maintained because there are irreconcilable conflicts between the members of the class plaintiff seeks to represent. See 3B Moore's Federal Practice, ¶ 23.07[3]; Wright, Federal Courts, § 72; See also William Goldman Theatres, Inc. v. Paramount Film Distributing Corp., 49 F.R.D. 35 (E.D.Pa.1969).[5] More specifically, it is contended that since the plaintiff, Sol S. Turnoff Drug Distributors, Inc., is engaged in both wholesale and retail operations, he cannot adequately represent either the wholesalers or the retailers because it will be in his individual interest to advance the interests of both wholesalers and retailers until it is determined which, if either, class can recover, and then advance the interests of that class to the exclusion of the other.

In order to resolve this issue we entered an order dated June 24, 1970, that the parties file legal memoranda and factual documentation to support their respective positions. In response to this order, the plaintiff has provided us with total sales statistics for Turnoff for the past four years which indicate that his operations are roughly less than two thirds wholesale and more than a third retail. For instance, in 1969, Turnoff's gross sales totalled $754,666.64, $503,-626.65 of which represented wholesale business and $249,039.99 of which represented retail business. In this regard, the plaintiff further contends that due to the nature of wholesale and retail operations in the drug business, the interests of pure wholesalers and pure retailers are not antagonistic in the context of the instant suit in that both seek to recover the excess increment in the price to them from manufacturers and importers of quinine and quinidine. In support of this contention, plaintiff has submitted the affidavit of the President of his company and a letter from the Chief of the Compliance Investigations Division of the Bureau of Narcotics and Dangerous Drugs of the Justice Department, both of which indicate that the distinction between "wholesalers" and "retailers" is blurred because manufacturers sell *directly* to both so-called retailers and so-called wholesalers, and that a significant proportion of so-called "wholesale" business represents sales to institutional buyers such as hospitals, nursing homes, etc. These averments are not substantially rebutted by the response of the defendants.

The plaintiff therefore contends that all members of his class suffered common damage in that, as a result of the conspiracy among the defendants, they had to pay excessive prices for quinine

---

5. The issues involved here arise pursuant to Rule 23(a) (2), (3) and (4), and Rule 23(b) (3) (A).

and quinidine products which they purchased from manufacturers. Moreover, it is alleged that, even if there are some instances where it develops that separate and distinct wholesale and retail markets exist for these drugs, then both wholesalers and retailers suffered damage independent of the higher prices that they were compelled to pay in that due to the defendant's conspiracy, supply of quinine drugs was very short, and had there been an ample supply they would have sold more of the drugs and reaped greater profits. Plaintiffs further urge that, in any event, since the proof of the existence of a conspiracy is essential before even reaching the question of which class can recover damages, all members of his class have a clear common interest on that issue.

We agree that at least at this stage of the case, all the members of the class plaintiff seeks to represent have a common interest in a favorable verdict on the issue of a conspiracy. It is, however, not inconceivable that at some stage of the case it might develop that the interests of the wholesalers and retailers in the class plaintiff seeks to represent might conflict in that they could desire to develop the facts in such a way that, if a conspiracy were established, it would be more likely that the defendants would be held liable to one group or the other. However, the possibility that such circumstances may appear, or that it may develop that the interests with respect to damages of several groups within the class plaintiff now seeks to represent will conflict, cannot at this point justify the denial of a class action. Should any of these possibilities mature, we could, pursuant to our power under Rule 23(c) (4) (B), divide the existing class into subclasses such as pure wholesalers, pure retailers, and wholesaler-retailers.[6] City of Philadelphia v. Emhart Corporation et al., *supra;* Eisen v. Car-

lisle & Jacquelin, 391 F.2d 555 (2nd Cir. 1968); State of Illinois v. Harper & Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill.1969); Philadelphia Electric Co. v. Anaconda American Brass Co., *supra.*

▆ We therefore conclude in accordance with Rule 23(a), that this class, which includes several thousand members, is so numerous that joinder of all members is impracticable; that the issue of the conspiracy is common to all members of the class; that the claims of the representative plaintiff are, at this point in the case, typical of the claims of the· class; and that the representative parties will fairly and adequately represent the interests of the class. In addition, pursuant to Rule 23 (b) (3), we find that, at least at this stage of the case, that "the questions of law or fact common to the members of the class predominate over any questions affecting individual members, and that a class action is superior to other methods for the fair and efficient adjudication of the controversy." "Here as in the normal antitrust case, proof of the conspiracy will present predominant questions of both law and fact." State of Minnesota v. United States Steel Corporation, 44 F.R.D. 559, 572 (D.C.Minn. 1968); Eisen v. Carlisle & Jacquelin, *supra;* Rule 23(c) (4) (B). In this respect, we note that, since the parties could probably not afford to bring individual actions, their interest in individual control of actions is minimal; that at this point there is only one other suit brought which is similar to this one (Lee's Prescription Shops, Inc. v. N. V. Nederlandsche, etc., S.D.Fla., Miami Div. No. 69–560–Civ.–W.M., cited in the defendant's main brief, p. 2); that because another suit by a consumer class is brought in this Court against the same defendants, it is desirable to concentrate the litigation of these claims in this Court; and that since the class members

6. Of course it is also conceivable that if more than these three classes had to be created in order to eliminate conflicts within any existing class that problems of manageability of the class action pursuant to Rule 23(b) (3) (D) might arise.

are readily identifiable, we do not at this juncture think that the class action is unmanageable.

Accordingly, since we conclude that at this point the plaintiffs have presented a proper class action, and since under these circumstances it is the better practice to tentatively allow the case to proceed as a class action, Green v. Wolf Corporation, 406 F.2d 291, 298, fn. 10 (2nd Cir. 1968), we will order that a class action may be maintained. At the same time, we fully reserve all of our powers under Rule 23(c) (1) to alter our order or deny class action treatment at any time as circumstances warrant.